IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTONIA GIBSON,           )
           )
        Plaintiff,        )
           )      Civil Action No: 09-604
        v.         )
           )
SHARON REGIONAL HOSPITAL     )
SYSTEM,           )
           )
        Defendant.      )

MEMORANDUM OPINION

CONTI, District Judge

## I.      Introduction

Pending before the court is the motion for summary judgment ("Motion," ECF No. 28) filed by defendant Sharon Regional Hospital System ("defendant" or "SRHS") with respect to claims asserted by plaintiff Antonia Gibson ("plaintiff" or "Gibson") under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000(e) *et seq*.; and the Pennsylvania Human Relations Act ("PHRA")[1], as amended 43 PA. CONS. STAT. §§ 951, *et seq*. Plaintiff initially filed a complaint with the Equal Employment Opportunity Commission ("EEOC") for race and age discrimination and retaliation and cross-filed with the Pennsylvania Human Relations Commission. Thereafter, plaintiff withdrew her claims for age discrimination

---

[1] PHRA claims are treated consistently with claims brought under federal antidiscrimination statutes. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006) (the analysis required for adjudicating plaintiff's claim under the PHRA is identical to a Title VII inquiry); Goosby v. Johnson & Johnson Med., 228 F.3d 313 (3d Cir. 2000) (same); Here, neither party argues that the PHRA requires a different analysis. This court will not separately address plaintiff's claims under the PHRA.

and retaliation.  The sole remaining claim plaintiff asserts against defendant is employment discrimination based upon her race and arising from her termination by defendant on October 6, 2008.  (First Amended Complaint, ECF No. 19.)  After considering the defendant's Motion and brief in support (ECF No. 30), plaintiff's response and brief in support (ECF Nos.  31, 32), the parties' combined statements of material facts ("CSF," ECF No. 38), and the other submissions of the parties, and drawing all reasonable inferences in favor of plaintiff, defendant's Motion will be granted for the reasons set forth below.

## II.     Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in h[er] favor.").

### A.     The Parties

SRHS is a comprehensive health care organization serving communities in and around Sharon, Pennsylvania.  (Brief in Support of Defendant's Motion for Summary Judgment 3; Jan Wetherstein ("Wetherstein") Dep. 6, 16, Mar. 3, 2010, ECF No. 30.)  Among other services, SRHS offers both inpatient and outpatient behavioral health services.  (Id.)  The fourth floor of Sharon Regional Hospital houses the Inpatient Behavior Health Unit (the "BHU"), with separate facilities for child/adolescent ("child") and adult patients.  (CSF ¶¶ 2, 4, ECF No. 38.)  The child unit houses twelve patients, while the adult unit has twenty-four beds and three seclusion rooms. (CSF ¶ 4, ECF No. 38.)  Mental health workers are assigned to work on the child unit and on the adult units.  (CSF ¶ 5, ECF No. 38.)  The mental health workers are directed by a nurse assigned

to their respective unit.  (Id.)  Defendant's management determines the number of mental health workers on a unit based upon the number of patients and their acuity.  (CSF ¶ 6, ECF No. 38.)  The child unit normally has one mental health worker and one nurse, and relies upon workers on the adult unit to respond to any emergencies that occur on the child unit.  (CSF ¶ 7, ECF No. 38.)

During the relevant time period, Cindi DeLouis ("DeLouis") was the director of Inpatient Behavioral Health Services ("BHS").  (CSF ¶ 3, ECF No. 38.)  DeLouis reported to Charles Hahn ("Hahn"), the vice president of BHS.  (Id.)  Wetherstein was the coordinator and a manager of BHS.  (Id.)  John P. Davidson ("Davidson") was the vice president of human resources.  (CSF ¶ 29.)  Rhonda Brewer ("Brewer") was a clinical manager.  (CSF ¶ 21, ECF No. 38.)

Gibson, an African-American female, was employed by defendant as a mental health worker on the BHU from May 10, 1999, until October 6, 2008.  (CSF ¶ 1, ECF No. 38.)  She was a member of the direct care staff responsible for monitoring and caring for patients on the adult unit of the BHU.   Gibson was directed by nurses assigned to her unit.  (CSF ¶ 5, ECF No. 38.)  Defendant terminated plaintiff after an incident that occurred on the BHU on September 13, 2008.  (CSF ¶ 1, ECF No. 38.)  Defendant's stated reasons for terminating plaintiff's employment are: a) a September 13, 2008 incident involving the request for a wheelchair; b) plaintiff's inability, even after it was explained to her, to articulate what she would have done differently if confronted with a similar emergency in the future; and c) plaintiff's prior work history.  (CSF ¶ 72, ECF No. 38.)

## B.      September 13, 2008 Incident

On September 13, 2008, the nurse on duty in the child unit, Cindy Simpkins ("Simpkins"), directed the mental health worker on the child unit that day, Melissa Nagy

("Nagy"), to call over to the adult unit for a wheelchair in order to transport a patient on the child unit, who had become ill, to a medical floor for treatment.  (CSF ¶ 8, ECF No. 38.)  Nagy called the adult unit and asked plaintiff to bring a wheelchair to the child unit.  (CSF ¶ 9, ECF No. 38.)

Plaintiff told Nagy that she was "unable to bring the wheelchair down due to the fact that she was the only mental health worker on duty, and [ ] was responsible for doing the fifteen-minute checks."  (CSF ¶ 11, ECF No. 38.)  In a follow-up report on the incident, Nagy stated that she asked plaintiff if one of the nurses could bring the wheelchair.  (CSF ¶ 12, ECF No. 38.)  Plaintiff told Nagy that "the nurses were off the unit, so was the secretary, and that as soon as they came back up for their dinner breaks, [plaintiff] would let them know that [the wheelchair] was something that [Nagy] needed."  (CSF ¶ 13, ECF No. 38.)  When the wheelchair did not arrive, Simpkins, the nurse on the child unit, directed Nagy to go down to the adult unit and get the wheelchair herself.  (CSF ¶ 14, ECF No. 38.)  Nagy did so and stopped by the conference room as she was leaving the adult unit where she saw plaintiff, the adult unit secretary, Jennifer Russell ("Russell"), and a nurse in the adult unit, Jessica Upshir ("Upshir"), seated at the table. (Id.)  Russell, Upshir, and a third unidentified person had returned to the unit at the same time Nagy came down to the adult unit to get the wheelchair.  (CSF ¶ 15, ECF No. 38.)  Moments before Nagy entered room and announced that she had retrieved the wheelchair herself, plaintiff finished the patient checks and entered the break room to discover that Russell and Upshir had returned from dinner.  (CSF ¶ 14, ECF No. 38.)

Nagy returned to the child unit with the wheelchair, and, along with the security guard, transported the ill patient to a medical unit on the fifth floor.  (CSF ¶ 16, ECF No. 38.)  Later that day, Russell called Nagy to ask her why she was so angry when she came to the adult unit to get the wheel chair.  Nagy responded that she previously asked plaintiff, to no avail, to have

someone bring a wheelchair to the child or adolescent unit.  (CSF ¶ 17, ECF No. 38.)  Russell told Nagy that plaintiff did not tell anyone in the adult unit that the child unit had an emergency, needed help, or had requested a wheelchair.  (Id.)

### C.    DeLouis' Investigation

After learning about the September 13, 2008 incident, DeLouis, the director of BHS, initiated an investigation to determine what had occurred and whether anything needed to be done to prevent a similar incident in the future.  (CSF ¶ 18, ECF No. 38.)  As part of the investigation, DeLouis interviewed and obtained written, signed statements from Nagy, Russell, and Upshir.[2]  (CSF ¶¶ 18, 77, ECF No. 38.)

In her statement Upshir, the nurse on the adult unit, noted that she was one of three staff members sitting in the conference room when Nagy came in and stated that she "got her own wheelchair, thanks."  (CSF ¶ 19, ECF No. 38)  Upshir reported that when she asked the others what that was all about, plaintiff stated that Nagy had called earlier to the unit asking for a wheelchair, but "[plaintiff] told [Nagy] that we were too busy to bring one to her."[3]  (Id.)  Upshir stated that prior to Nagy's appearance, Upshir was not aware of any medical situation occurring on the child unit, or any need for a wheelchair by the child unit staff.  (Id.)

Russell, the secretary on the adult unit, stated in her report that plaintiff told Upshir and her that the child unit called the adult unit and requested a wheelchair.  (Id.)  Russell indicated that she called Nagy approximately fifteen minutes after the conference room incident.  At that time Nagy told Russell that she had requested a wheelchair, as soon as possible, due to a

---

[2] Andrew Krantz, a social worker on the child unit at the time, also submitted a report to DeLouis.  (CSF ¶ 18.)

[3] Plaintiff denies telling Upshir that she told Nagy that plaintiff was too busy to take the wheel chair to the child unit.  (CSF ¶ 19.)  Plaintiff testified that she told Russell and Upshir that the child unit requested a wheelchair.  (Id. )

medically unstable patient that needed to be transported to a medical floor. According to Russell, plaintiff did not communicate Nagy's request. (CSF ¶ 20, ECF No. 38.)

DeLouis did not ask plaintiff to provide a written statement about the September 13, 2008 incident. (CSF ¶ 78, ECF No. 38.) Instead, DeLouis interviewed plaintiff and drafted a document entitled, "Note to Employee File" ("Note"). Plaintiff did not sign the Note or have any opportunity to review it before the document was placed in her file. (Id.) Plaintiff testified that the Note differs substantially from the conversation that she actually had with DeLouis in six ways:

1) DeLouis stated in the Note that,

   Toni [Gibson] stated that at the time of the phone call, she and one of the RN staff were on the adult unit.

(CSF ¶ 79, ECF No. 38.) Plaintiff, however, reported to DeLouis that she was not aware of the location of the nurse, who was to be on the unit, and that she searched for the nurse, but was unable to locate her.

2) DeLouis stated in the Note that,

   Toni [Gibson] admits that once she hung up the phone, she did not go to find the RN on the floor to report this information.

(Id.) Plaintiff denied this admission and reiterated that she searched for the nurse, but was unable to locate her.

3) DeLouis stated in the Note that,

   Toni [Gibson] stated she did not inform [the two staff members] of the patient emergency or the request for wheelchair assistance on the child unit.

(Id.)  Plaintiff denied making this statement and testified that Nagy arrived to retrieve the wheelchair at the same moment that plaintiff learned the other employees assigned to the unit had returned from break.

       4)     DeLouis stated in the Note that she gave plaintiff four suggestions for responses she could have taken upon receiving the request:

> a). Toni [Gibson] could have immediately sought direction from the RN  (Toni's superior) on the adult unit as to how they (the adult staff) should have responded to this emergent request;
>
> b). Toni [Gibson] could have placed a phone call directly to the House Nursing Supervisor for direction;
>
> c) Toni [Gibson] could have discussed the request with the RN on her unit and offered to take the wheelchair to the child unit staff; and
>
> d) At a minimum, Toni [Gibson] could have initiated finding a wheelchair on the adult unit and contacted the child unit to let them know that a chair was being placed in the hallway for them to pick up if she felt they could not leave the unit.

(Id.)  Plaintiff testified that DeLouis told her two suggestions, i.e., plaintiff could have: 1) looked for the wheelchair, or 2) called the nursing supervisor – who was not identified and from whom defendant did not solicit a statement indicating that she or he was present and available.[4] (CSF ¶ 79, ECF No. 38.)  Neither Upshir nor Nagy contacted the nursing supervisor.  (CSF ¶ 24.)  The remaining two "suggestions" required that the nurse assigned to the unit be present, and plaintiff stated she told DeLouis that was not the case.

---

[4] It is not clear from the record whether Gibson's testimony was that she specifically denied DeLouis made four suggestions, or whether Gibson believed that only two of DeLouis' suggestions were viable. (CSF ¶ 79, ECF No. 38.)

5)  DeLouis stated in the Note that,

> Toni [Gibson] admitted she did nothing with the request and recognized and admitted that she was neglectful to the request thus placing a patient at further risk by her own lack of response.

(Id.)  Plaintiff testified that these were DeLouis' words and not hers and that she told DeLouis, as the only staff member on the adult unit, she had a responsibility to care for the fourteen patients of that unit.

6)  DeLouis stated in the Note:

> Discussed with Toni [Gibson] that she had a responsibility to notify her superior, the RN on the unit. As the licensed person responsible to oversee and direct the patient care, the RN is the person who will make the decisions. Toni admitted that she actively did not seek direction from the RN or other staff returning from lunch. Instead she chose to make the decision to do nothing.

(Id.)  In response to this notation, plaintiff testified that she informed DeLouis that she was not aware of the location of the nurse that was to be on the unit and searched for the nurse, but was unable to locate her.   Plaintiff reiterated that at the time she became aware that the other two staff members had returned from break, Nagy entered the room and informed all who were present that she had obtained a wheelchair.  (Id.)

During plaintiff's deposition, the following colloquy occurred with respect to DeLouis' Note:

> DEFENSE COUNSEL:  In that paragraph it reads, "Toni [Gibson] admitted that she actively did not seek direction from the R.N. or other staff returning from lunch.  Instead, she chose to make the decision to do nothing."
> Is that an accurate statement of what you told Cindi DeLouis?
>
> PLAINTIFF:  No, sir.  That is not an accurate statement.
>
> DEFENSE COUNSEL:  In what way is it inaccurate?

8

> PLAINTIFF:  . . .  I didn't admit anything.  I told facts that I was - - at the time of the phone call, that I had stated to Ms. Nagley [sic] I was unable to fill her request and stated to her why.  And as far as, instead she chose to - - to make a decision to do nothing, that's not true.  I made sure that our 14 patients were safe.  In my opinion, it was Ms. Nagy or the nurse on the child unit to do something, not myself.
>
> DEFENSE COUNSEL:  As you reflect back on the circumstance today, do you believe that you did the right thing that day?
>
> PLAINTIFF:  Protecting my 14 patients, yes, sir.

(CSF ¶ 26; Gibson Dep. 156, Apr. 5, 2010, ECF No. 38.)

Upon completion of DeLouis' investigation, DeLouis and a clinical manager, Brewer, met with plaintiff to discuss the events of September 13, 2008.  (CSF ¶ 30, ECF No. 38.)  In response to DeLouis' question about whether plaintiff looked for a wheelchair, plaintiff stated, "I was doing my 15-minute checks on the 14 patients that I had that I was in care of.  They were in my care."[5]  (CSF ¶ 22, ECF No. 38.)  DeLouis testified that during the meeting, she provided plaintiff with the four aforementioned suggestions about how plaintiff could have responded appropriately to the request.  (CSF ¶ 27, ECF No. 38.)

DeLouis told plaintiff that she placed a patient at risk by not responding in any way to the request for the wheelchair.  (CSF ¶ 25, ECF No. 38.)  Plaintiff denied any wrongdoing and believed she was justified in not responding Nagy's request.  (CSF ¶ 26, ECF No. 38.)  DeLouis reminded plaintiff that the child unit is only ever staffed with two workers, and in response to a call for help, workers are to respond first and ask questions later.  (CSF ¶ 27, ECF No. 38.)

At the end of her investigation DeLouis made three conclusions:  1) plaintiff claimed she was the only staff member on the adult unit at the time Nagy called; 2) two other staff members

---

[5] When defendant's counsel asked plaintiff if she had actually looked for a wheelchair herself, plaintiff responded, "no, sir."  (CSF ¶ 23.)

returned to the unit within a few minutes after Nagy's call; and 3) plaintiff did not inform anyone on the unit about the full nature of Nagy's request. (CSF ¶ 21, ECF No. 38.) When DeLouis asked plaintiff why she failed to respond to the request for assistance, plaintiff's responded, "I had patient checks to do," and "I was the only MHW on the floor."[6] (Id.) Plaintiff's indication that she would not act differently if the situation presented itself again, after DeLouis' instruction to plaintiff about possible responses, caused DeLouis to question plaintiff's ability to provide appropriate patient care. (CSF ¶ 28, ECF No. 38.)

DeLouis' reviewed the situation with defendant's vice president of human resources, Davidson, who approved DeLouis' recommendation to terminate plaintiff. Davidson based his decision upon the September 13, 2008 incident and plaintiff's prior work performance. (CSF ¶ 29.) On October 6, 2008, DeLouis, Brewer, a clinical manager, and Wetherstein, the BHS coordinator, met with plaintiff to inform her about the termination decision. (CSF ¶ 30, ECF No. 38.)

Plaintiff appealed the decision in a letter dated November 27, 2008, wherein she stated:

> The reason for my appeal is that I was following Sharon Regional Health Systems [sic] policies and procedures. And I did not fail to act when a Coworker needed my assistance in a potentially critical situation. I was told the reason for my termination was because I did not take a wheel chair to the Adolescent Unit.

(CSF ¶ 78, ECF No. 38.) Plaintiff indicated in the letter that the adult unit nurse was "passing medication" at the time of the incident. (Id.)

---

[6] With respect to defendant's policy on the matter, Nagy testified that mental health workers are not allowed to leave the unit and that she has refused to leave a unit due to lack of coverage. With respect to the September 13, 2008 incident, Nagy "panicked" over leaving another employee observing nine patients, which included the patient needing the wheelchair. (See Pl.'s App., Ex. 3; Nagy Dep. 19, Mar. 2, 2010.)

    Similarly, Richard Oliver, ("Oliver"), a former mental health worker employed by defendant, testified that defendant's policy mandates a ratio of one mental health worker per ten patients and one nurse in each unit. (CSF ¶ 27.) Oliver understood defendant's policy to dictate that a mental health worker was not to leave the unit if it would leave patients unsupervised. (CSF ¶ 27.)

### D.     Gibson's Prior Work Performance

Davidson, the vice president of human resources, concluded plaintiff's prior work history demonstrated that her failure to respond to the wheelchair request was not an isolated incident, but represented a pattern of behavior that called into question her suitability for the position of mental health worker.  (CSF ¶ 31, ECF No. 38.)  Plaintiff denies that she had any actual performance issues prior to her performance.  (Id.)  In DeLouis' view, plaintiff performed certain aspects of her job satisfactorily, but conveyed to her supervisors and co-workers an attitude that was rigid, inflexible and confrontational.  (CSF ¶ 32, ECF No. 38.)  DeLouis expressed concern that plaintiff's history of interactions with patients and co-workers demonstrated a lack of collaborative work with other staff.  (Id.)

Wetherstein, the BHS coordinator, stated that he discussed with plaintiff alleged complaints lodged by several patients against plaintiff in defendant's "Make a Difference" cards. (CSF ¶ 33, ECF No. 38.)  Wetherstein noted that, in each instance, plaintiff denied any wrongdoing and appeared to lack insight about how her behavior could have caused a problem. (Id.)  In contrast, plaintiff alleges that Wetherstein brought to her attention a single patient's complaint about a number of incidents which plaintiff denied occurred.   (Id.)  Roger Winston ("Winston"), another mental health worker employed by defendant from 2002 or 2003 until 2004, testified that defendant always took a patient's word over that of the employee when complaints were made, regardless of the state of the patient's mental health.  (Id.)

Plaintiff received numerous write-ups for attendance, tardiness and refusals of mandatory overtime, and a written counseling as a result of two complaints from other staff members concerning her attitude.   (CSF ¶¶ 34, 35, ECF No. 38.)  The first involved a confrontation with another mental health worker, Anna Brooks ("Brooks").  Brooks reported that plaintiff attempted

to convey sensitive information to Brooks while she was monitoring patients in the smoking room during their smoke break. (CSF ¶ 35, ECF No. 38.) According to Brooks, plaintiff grabbed her arm when she attempted to walk away from plaintiff. Plaintiff testified that she requested Brooks to come out of the smoking room and into the hallway so that plaintiff could talk to her. (CSF ¶ 38, ECF No. 38.) According to plaintiff, Brooks did so, plaintiff relayed the information and Brooks reentered the smoking room:

> DEFENSE COUNSEL: So you went out and got her from the smoking room? She came out of the smoking room, you told her the information you were supposed to tell her, and she went back into the smoking room. Is that correct?
>
> PLAINTIFF: Yes.

(Id.)

As a result of this incident, Brooks asked not to be scheduled on the same unit with plaintiff. (CSF ¶ 35, ECF No. 38) When Wetherstein interviewed plaintiff about the incident with Brooks, plaintiff initially stated that she did not remember grabbing Brooks' arm. (CSF ¶ 36, ECF No. 38) When Wetherstein asked plaintiff if her inability to remember the incident meant that it could have happened, plaintiff said, "[n]o, I didn't do it." (Id.) Brooks' version of events was accepted as the truth and plaintiff was directed by Wetherstein, the coordinator of BHS, to attend the Employee Assistance Program ("EAP"). (CSF ¶¶ 35, 40, ECF No. 38.) Plaintiff testified that she was assured by correspondence issued at the time that she was being directed to EAP to ensure a safe work place, and that the action was not an accusation by management or a disciplinary action. (CSF ¶ 35, ECF No. 38.) Wetherstein interpreted this incident as a demonstration of plaintiff's insensitivity to the effects of her behavior on others. (CSF ¶ 37, ECF No. 38.)

The second incident involved Rob Hawkes ("Hawkes"), a nurse who complained that plaintiff was insubordinate when he tried to redirect her regarding work assignments. (CSF ¶ 35, ECF No. 38.) On July 26, 2005, Hawkes reported that plaintiff refused to be assigned to the child unit because she claimed it was too cold, and refused to take directions from the nurse. ("CSF ¶ 42, ECF No. 38.) Hawkes described plaintiff as an especially difficult person with whom to work. (Id.)

In December 2006, DeLouis suspended plaintiff for five days based upon her alleged rude behavior while searching patients' rooms. (Id.) Another mental health worker informed plaintiff that there were pretzels - considered contraband - on the floor, and the nurse on duty approved searching patients' rooms. (Id.) Upon investigating the incident, DeLouis determined that plaintiff carried out the searches against the specific instruction of the nurse in charge of the unit, and conducted it in a manner that caused one patient to become physically aggressive and other patients to become irritable and agitated. (CSF ¶ 43, ECF No. 38.) Plaintiff's account of the outcome of her interview with DeLouis with respect to the incident was that DeLouis accepted the need for the searches, but accepted the patients' word that plaintiff was rude while conducting the searches. (CSF ¶ 42, ECF No. 38.) Plaintiff denied that her behavior was in any way disrespectful, discourteous or inflammatory. (CSF ¶ 44, ECF No. 38.) DeLouis questioned plaintiff's ability to discern the effects of her interactions on others. (Id.)

In February 2008, DeLouis suspended plaintiff for five days based upon plaintiff's interactions with another patient. The patient reported that plaintiff treated him "like a child" by speaking to him in a rude and disrespectful manner. (CSF ¶ 45, ECF No. 38.) Plaintiff reported the incident to police after a different patient told plaintiff that the patient in issue threatened to "snap [plaintiff's] neck." (Id.) In her report about the incident, DeLouis stated that the patient in

issue told her that he felt the whole incident caused him to go backward in his treatment.  (Id.)

Plaintiff's account of the incident was that she told the patient in issue, along with another

patient in the dining room at the time, it was time to check vitals. The patient in issue went into

the exam room where he became verbally abusive.  Plaintiff asked him to leave the exam room,

and that was the end of the incident.  (CSF ¶ 46, ECF No. 38)

In July 2008, plaintiff requested to be allowed to bid on available shifts elsewhere in the

hospital.  (CSF ¶ 47, ECF No. 38.)  DeLouis informed plaintiff that she would approve plaintiff's

request only if she had no code of conduct violations for the next six months.  (Id.)

### E.      Allegations of Racial Discrimination

Plaintiff alleges that the BHS coordinator (Wetherstein), the vice president of human

resources (Davidson), the director of the BHS (DeLouis), and the vice president of the BHS

(Hahn), are racially biased against African-Americans.  (CSF ¶ 59, ECF No. 38.)  Plaintiff

testified that defendant's management fabricated many of the incidents it indicated reflected

plaintiff's poor work performance, in contrast to white employees of the unit that were treated

more favorably because allegations were not fabricated against them.  (Id.)  Wetherstein

informed plaintiff repeatedly that other employees, all of whom were white, found plaintiff to be

threatening.  (CSF ¶ 55, ECF No. 38.)  Plaintiff believes defendant discriminated against her

based upon her race because the employees and patients who complained about plaintiff were all

white, and defendant's management believed their accounts of incidents over plaintiff's denials.

(CSF ¶¶ 42-46, 48, ECF No. 38.)

Oliver, an African-American, who worked with plaintiff for approximately six years,

stated that he never had any concerns with plaintiff's behavior during that time.  (CSF ¶ 55, ECF

No. 38.)  Oliver and Winston, another African-American former mental health employee of

defendant, each testified that they were treated unfairly in comparison to white employees. (Id.)

Oliver testified that upon his return from service in Iraq, he suffered from severe PTSD[7] and

defendant refused to make any accommodations regarding his schedule. Oliver indicated that

defendant's refusal to accommodate his schedule eventually resulted in his termination of

employment and that the "final straw" was him calling-off on a Saturday morning when he was

scheduled to work. (CFS ¶¶ 55, 74, ECF No. 38.) Winston testified that he was consistently

assigned to work afternoons on every holiday, while no white employees were given similar

assignments. (CSF ¶ 55, ECF No. 38.)

Plaintiff testified that the BHS coordinator, Wetherstein, discriminated against her in

2002, in handling the incident involving plaintiff's co-worker, Brooks, by taking the word of

Brooks – who is white - over the word of plaintiff with respect to Brook's claim that plaintiff

grabbed her arm. (CSF ¶¶ 40, 49, ECF No. 38.) Brooks was not required to go to EAP or

otherwise disciplined for making an allegedly false accusation against plaintiff. (CSF ¶ 55, ECF

No. 38.) With respect to the 2008 incident, where there were no witnesses, plaintiff testified that

defendant's management discriminated against plaintiff because it suspended her based upon the

word of a white patient "over [her]self who was following [defendant's] policies and

procedures." (CSF ¶¶ 50, 57, ECF No. 38.)

Plaintiff testified that the wheelchair incident, was "definitely based on race," because

Nagy "had made statements that were untrue," and management "blew this way out of

proportion." (CSF ¶ 51, ECF No. 38.) Plaintiff testified that DeLouis, Russell and Upshir all

lied in their statements about the wheelchair incident and that DeLouis' swift and harsh

---

[7] The court considers that Oliver's reference to PTSD is to post traumatic stress disorder.

discipline "had no merit," and  complained that Nagy should have been disciplined for filing a frivolous complaint against her.  (CSF ¶¶ 52, 58, 59, ECF No. 38.)

No racial comments were ever directed toward plaintiff.  She, however, was present in 2005 or 2006 when a former mental health worker at SRHS, Roxanne Hartzell ("Hartzell"), remarked that black or African-American people find it acceptable to use the term "nigger" or "nigga" to refer to each other, while leading a discussion group with patients.  (CSF ¶¶ 60, 61, ECF No. 38.)  Winston and Oliver - both African-American - each testified that they were not present when Hartzell made the remarks, but that they were upset by the remarks as were some patients - white and black.  (CSF ¶ 62, ECF No. 38.)

Defendant asserted it responded to the incident by inviting Reverend Ralph Newell ("Newell"), a local minister, to speak to a group of mental health workers on the issue of cultural sensitivity.  (CSF ¶ 63, ECF No. 38.)  Newell, however, testified that he was invited to defendant's facility by a fellow member of a committee with the behavioral health commission, because there were issues with language and poor communication.  (Id.)  Newell testified that he was well-versed in cultural sensitivity training, which focuses on an individual's background - rather than exclusively on race.  (CSF ¶ 64, ECF No. 38.)  Newell described his presentation as very similar to talks he gave in churches, and stated that his presentation was "very very well received" by both the African-American and Caucasian employees in attendance.  (CSF ¶ 65, ECF No. 38.)  Hartzell and plaintiff attended  Newell's presentation.  (CSF ¶ 66, ECF No. 38.) Plaintiff and Oliver – who did not attend Newell's presentation - opined that it was an inadequate response to Hartzell's comments.  (Id.)  Neither plaintiff nor Oliver heard Hartzell use the "n-word" again.   (CSF ¶¶ 67, 68, ECF No. 38.)

In another instance, Ilona Gibson ("I. Gibson"), a white nurse on the mental health unit, asked plaintiff and a third person the identity of a black or African-American social worker who was on the unit on a particular day. (CSF ¶ 69, ECF No. 38.) Plaintiff took offense to this remark because, in asking who the woman was, I. Gibson referred to the woman as being black, and repeated herself when neither plaintiff nor the other employee gave any response. (Id.)

In 2005 or 2006, I. Gibson commented to plaintiff that she "thought people of your color did not wear mascara." (CSF ¶ 70, ECF No. 38.) Plaintiff responded that she was not wearing any makeup. Later that evening, I. Gibson apologized to plaintiff, stating she did not mean to offend plaintiff. (Id.) Plaintiff felt discriminated against because I. Gibson was not disciplined for her remark. (CSF ¶ 71, ECF No. 38.)

Oliver and Winston, both African-American mental health workers formerly employed by defendant, were terminated during plaintiff's employment. As previously mentioned, Oliver testified that he was terminated, in part, because defendant failed to make any accommodations for him with respect to his severe PTSD, for which he took a number of medications. (CSF ¶ 55, ECF No. 38.)

Plaintiff alleges that two white employees, Linda Pennington ("Pennington") and Bill Bell ("Bell"), were not suspended for coming in late when they were called in on their days off. Plaintiff based this allegation upon not hearing Pennington or Bell talk about any disciplinary actions against them. (CSF ¶¶ 75, 76, ECF No. 38.) Plaintiff was not suspended for her tardiness. (CSF ¶ 75, ECF No. 38.)

IV.     **Standard of Review**

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

. . .

**(c) Procedures.**

**(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; see also Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the

non-moving party in light of his burden of proof.") (citing <u>Anderson</u>, 477 U.S. at 248; <u>Celotex Corp.</u>, 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

**V.     <u>Discussion</u>**

Plaintiff asserts a claim of race discrimination under Title VII based upon her termination on October 6, 2008.  Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 319 (3d Cir. 2008) (citing <u>Shelton v. Univ. of Med. & Dentistry of N.J.</u>, 223 F.3d 220, 224 n.4 (3d Cir. 2000)).  Since 1972

Title VII has required that personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex or national origin."  42 U.S.C. § 2000e-16(a).  The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.  Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims.  Both parties agree that the McDonnell Douglas analysis applies to plaintiff's race discrimination claim.  The McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination.  The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  Burdine, 450 U.S. at 254.  In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"  Id.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  Simpson, 142 F.3d at 644 n.5.  The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that

there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added) (citations omitted).

Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,' . . . ." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (citations omitted). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

### A. Burden-Shifting Framework

#### 1. Prima Facie Case

To state a claim for race discrimination under Title VII where a plaintiff is terminated, the plaintiff must show by a preponderance of the evidence that she: 1) is a member of the protected class; 2) was qualified for the position; 3) was discharged; and 4) was discharged under circumstances giving rise to an inference of discrimination. Berndt v. Kaiser Aluminum & Chem. Sales, Inc., 789 F.2d 253, 257 (3d Cir. 1986).

Defendant does not dispute that, for purposes of the Motion, plaintiff established a prima facie case. Plaintiff is a member of a protected class as she is black, she was qualified for the position as she worked for defendant for over eight years, she suffered an adverse employment action when she was terminated on October 6, 2008, and she has alleged that her termination gives rise to an inference of discrimination because others outside of her protected class – white persons – were more favorably treated.

## 2.        Nondiscriminatory Reasons

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory.  Burdine, 450 U.S. at 254.  An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision.  Fuentes, 32 F.3d at 763; see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers.  Burdine, 450 U.S. at 254; see Bd. of Trs. of Keene St. Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Here, plaintiff does not dispute that defendant met its burden of production by articulating legitimate business reasons.  Defendant stated that plaintiff was terminated due to her: 1) complete lack of a response to the request of a wheelchair by a co-worker on September 13, 2008; 2) inability to articulate how she would have responded differently after DeLouis presented several appropriate responses; and 3) history of inappropriate interactions with patients and staff.   The court agrees that these proffered reasons satisfy defendant's "relatively light burden" of production.  Fuentes, 32 F.3d at 763.  The only remaining issue is whether plaintiff can establish that defendant's proffered reasons are a pretext for discrimination.  Reeves, 530 U.S. at 142-43; Salisbury v. City of Pittsburgh, Civ. A. No. 08-cv-0125, 2010 WL 654490, at *7 (W.D. Pa. Feb. 23, 2010) ("'the McDonnell Douglas framework - with its presumptions and burdens' - disappears[s], . . . and the sole remaining issue [is] 'discrimination vel non' …") (quoting Reeves, 530 U.S. at 142-43) (brackets in the original).

### 3.     Pretext

The final analysis of the <u>McDonnell Douglas</u> burden-shifting framework requires that,

> [o]nce the employer answers its relatively light burden by
> articulating a legitimate reason for the unfavorable employment
> decision, the burden of production rebounds to the plaintiff, who
> must now show by a preponderance of the evidence that the
> employer's explanation is pretextual (thus meeting the plaintiff's
> burden of persuasion).

<u>Fuentes</u>, 32 F.3d at 763.  In order to survive summary judgment, once an employer has stated a

legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must

satisfy one of two prongs articulated by the United States Court of Appeals for the Third Circuit

in <u>Fuentes</u>.  That is:

> [T]he plaintiff must point to some evidence, direct or
> circumstantial, from which a factfinder could reasonably either (1)
> disbelieve the employer's articulated legitimate reasons; or (2)
> believe that an invidious discriminatory reason was more likely
> than not a motivating or determinative cause of the employer's
> action.

<u>Id.</u> at 764; <u>Jones</u>, 198 F.3d at 410.  Plaintiff must do more than show that the employer was

wrong or mistaken.  <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006) (citing <u>Fuentes</u>,

32 F.3d at 764).

### a.     Fuentes: Prong One

In order to overcome summary judgment and bring her case to trial, a plaintiff must

submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated

reason for the adverse employment action.  The plaintiff does not need to produce evidence that

necessarily leads to the conclusion that her employer acted for discriminatory reasons, <u>Sempier</u>

<u>v. Johnson & Higgins</u>, 45 F.3d 724, 728 (3d. Cir. 1995), or produce additional evidence beyond

her prima facie case, <u>Fuentes</u>, 32 F.3d at 764, in order to discredit the employer's articulated reason.  The plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder *could* rationally find them ''unworthy of credence'' and hence infer that the employer did not act for [the asserted] non-discriminatory reason.

<u>Fuentes</u>, 32 F.3d at 765 (quoting <u>Ezold v. Wolf, Block,Schorr, & Solis-Cohen</u>, 983 F.2d 509, 531 (3d Cir. 1992)).

"The question asked in prong one of the <u>Fuentes</u> test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination." <u>Horner v. Allegheny Gen. Hosp.</u>, Civ. A. No. 07-1634, 2010 WL 724452, at * 14 (W.D. Pa. Mar. 1, 2010) (citing  <u>Keller v. ORIX Credit Alliance</u>, 130 F.3d 1101, 1109 (3d Cir. 1997)).  Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it.  <u>Id.</u> (discussing <u>Brewer v. Quaker St. Oil Ref. Corp.</u>, 72 F.3d 326 (3d Cir. 1996)).  The court is not permitted to set its own standards for the employer or get involved in the employer's subjective business decisions.  <u>Ezold</u>, 983 F.2d at 527.

Here, plaintiff argues that defendant's nondiscriminatory, legitimate reasons were pretext for race discrimination.  As mentioned above, defendant's stated reasons for terminating plaintiff's employment were: 1) the September 13, 2008 incident involving the request for a wheelchair; 2) plaintiff's inability, even after it was explained to her, to articulate what she would have done differently if confronted with a similar emergency in the future; and 3) plaintiff's prior work history.  (CSF ¶ 72.)

In essence, plaintiff asserts that her Caucasian co-workers were liars and defendant's management involved in the decision to terminate her were racist because they only believed the Caucasians. Plaintiff did not adduce evidence, however, to call into question management's reliance upon the truthfulness of the other employees involved in various incidents. There was no showing that defendant's management knew or had reason to know that those employees were lying. Johnson v. St. Luke's Hosp., Civ. A. No. 06-3417, 2007 WL 3119845, at *7 (E.D. Pa. Oct. 23, 2007) (holding that opinion expressed by, "I know she did it because I'm black," did not support bias and could not establish pretext). Defendant's management believing the accounts of Nagy, the mental health worker on the child unit, Russell, the secretary on the adult unit, and Upshir, the nurse on the adult unit, as opposed to plaintiff's account of the wheelchair incident of September 13 2008, does not - standing alone - establish pretext, even if the statements of the Caucasian employees were not accurate. See Watson v. Southeastern Pa. Transp. Auth., 207 F.3d 207, 222 (3d Cir. 2000) (an employer is permitted to take an adverse employment action for a reason that is not "true" in the sense that it is not objectively correct, as long as the employer acted in good faith); see also Sulit v. Fed. Reserve Bank of Phila., Civ. A. No. 08-2081, 2009 WL 2776480, at *6 (E.D. Pa. Aug. 28, 2009) (finding plaintiff's assertions that the decision-makers relied upon statements by people who harbored racial animus toward the plaintiff did not establish or suggest that anyone with such animus "influenced or participated in the decision" to terminate the plaintiff); Johnson, 2007 WL 3119845, at *7 (finding that plaintiff's disagreement with her supervisor's characterization of incidents with co-workers was not evidence that those incidents were improperly written up; the plaintiff "must do more than simply deny the truth of [the employer's] proffered reason; she must come forward with Rule 56 'specific facts' to support her pretext theory") (quoting Fed. R. Civ. P. 56(e)).

Plaintiff argues that DeLouis' differential treatment of witnesses while conducting her investigation is evidence of inconsistencies with respect to defendant's preferred reasons for terminating plaintiff. Plaintiff points to the signed statements of Nagy, Upshir and Russell, indicating that each prepared and reviewed their recollection of the events of September 13, 2008, while DeLouis set forth her version of plaintiff's recollection of the events on that day in the Note which plaintiff did not sign or have the opportunity to review. (CSF ¶78, ECF No. 38.) Plaintiff asserts that this inconsistency infers that DeLouis did not wish plaintiff to see the inaccurate information which DeLouis intended to use to support her recommendation of termination. This inconsistency, however, is not sufficient to cast doubt on the credibility of defendant's articulated reasons for terminating plaintiff. See Macon v. Kings Family Rest., Civ. A. No. 06-300, 2007 WL 1366789, at *7 (W.D. Pa. May 7, 2007) (finding the plaintiff's argument that the employer's investigation included written reports of females, but not of plaintiff, did not support an inference of pretext) (citing Martin v. Health Care & Ret. Corp., 67 F. App'x 109, 112-13 (3d Cir. 2003)). "Even if Defendant was remiss in not obtaining a written statement of Plaintiff, such evidence does not support an inference of pretext." Id. (citing Fuentes, 32 F.3d at 766-67 (failure to give plaintiff a chance to tell her side of the story cannot support a finding of pretext). While plaintiff did adduce evidence to show that the information, which was contained in the Note authored by DeLouis and upon which defendant relied in its decision to terminate plaintiff, was inconsistent with certain of plaintiff's statements, plaintiff did not refute that DeLouis reviewed the statements of Nagy, Upshir and Russell which were consistent with DeLouis' rationale for plaintiff's termination and plaintiff did not dispute that at least two suggestions were made by DeLouis for possible actions plaintiff could take in future

situations. Plaintiff quarrels with the suggestions, but does not deny she expressed her belief that no actions – other than what she took – could have been taken.

Plaintiff admitted that she made no effort to locate the wheelchair or to alert anyone that the child unit was in immediate need of a wheelchair. Plaintiff's insistence that she did the right thing by following defendant's policies because she was the only mental health worker on the adult unit is not sufficient to raise a material fact where the nondiscriminatory evidence to support defendant's reason for terminating her is defendant's concern that she could not see the inappropriateness of that response. It is undisputed that plaintiff believed she did nothing wrong and could not have acted in a different manner. Whether defendant is right in assessing that there were other actions plaintiff could have taken is not the question. It is whether she refused to see that there were any alternatives. Plaintiff points to her refuting that there were four suggestions made by DeLouis.[8] She points to there being two suggestions made. What she does not dispute, however, is that she believed those suggestions were wrong and that she was right. The undisputed facts show there was a disagreement about the appropriateness of her conduct and she refused - and still refuses - to see any other way to act. The rub is her unwillingness to engage in a dialogue to formulate a response that would be in keeping with her duty to the patients on her unit and her need to provide assistance. The record is clear that there were suggestions made and she adamantly refused to consider any other course of action. Plaintiff tries to overcome this evidence by arguing the suggestions were not helpful, i.e., the nursing supervisor was not available to be called on September 13, 2008. She, however, refused to consider how to locate the supervisor or, if in the future, what she should do if the supervisors were available. She did not refute that she could have pushed the wheelchair to the hallway.

---

[8] But see *supra* text accompanying note 4.

This court cannot second guess the appropriateness of those suggestions. See Johnson, 2007 WL 3119845, at *7 (granting summary judgment where employer alleged it fired plaintiff because she had "shown that [she was] either unwilling or unable to comply with [its] standards of performance/customer service expectations").

With respect to plaintiff's past employment performance, plaintiff claims that these incidents did not occur, or occurred differently than defendant's management portrayed. It is undisputed that complaints were made and documented and the basis of many of the complaints pitted plaintiff's word against the word of the complainants. In considering whether – standing alone - a plaintiff's subjective belief regarding her performance concerning issues of staff conflict is evidence of pretext, several courts have determined that it is not; rather, it is the employer's belief that governs. See Jones v. Polk Ctr., Civ. A. No. 07-204, 2009 WL 700686, at **5-6 (W.D. Pa. Mar. 11, 2009) (finding that employee's subjective personal judgment of her own performance, or challenging the accuracy of an alleged comparator's performance evaluation, is not evidence of pretext) (citing Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991), overruled in part on other grounds by St. Mary's Honor Ctr., 509 U.S. 502 ("the fact that an employee disagrees with an employer's evaluation [of her performance] does not prove pretext"); see also Paich v. Nike, Inc., Civ. A. No. 06-1442, 2008 WL 696915, at **10-11 (W.D. Pa. Mar. 12, 2008) (dismissing plaintiff's claims of reverse discrimination where the record was replete with complaints regarding the plaintiff's performance; the plaintiff's denial that the majority of the allegations happened and the allegation that the employer took the complaints of female employees at face value were insufficient to show that the employer's decision was motived by discriminatory animus); Sulit, 2009 WL 2776480, at *3 (E.D. Pa. Aug. 28, 2009)

(finding the fact that plaintiff denied the underlying conduct was irrelevant absent any evidence of record to undermine the employer's belief).[9]

The court does not question the sincerity of plaintiff's beliefs and is mindful that she is African-American and all defendant's management and employees upon whose word the management relied are Caucasian. "The Court must look at all of the evidence in context, including not limited to [plaintiff's] status as . . . [a] black employee." Jackson v. Lehigh Valley Physicians Gr., Civ. A. No. 08-3043, 2010 WL 1630737, at *16 (E. D. Pa. Apr. 20, 2010) (denying summary judgment on the plaintiff's race discrimination claim where it was not clear whether several questionable investigations by the defendants were motivated by racial bias). In considering the plaintiff's status as the employer's only black employee, the court in Jackson stated:

> On the one hand, being the only minority employee in a department is not a "free-for-all" pass allowing a person to claim discrimination just because he or she was treated in an adverse manner. On the other hand, in some circumstances it may be reasonable to infer that an employer who consistently mistreats its only black employee, allows/arranges for her to be left out of a Department brochure photo, and doesn't seek out "her side of the story" in serious workplace disputes while seeking out the opinions of non-black employees, may be doing so for race-related reasons. A jury must resolve the dispute.

Jackson, 2010 WL 1630737at *16 n.21.

Here, plaintiff was given the opportunity to give her side of the story and adduced no evidence to show why defendant's reliance on the statements against her was not reasonable as opposed to her denial of wrongdoing. She did not point to evidence from which it could be

[9] See Thimons v. PNC Bank, N.A., Civ. A. No. 04-1770, 2006 WL 2089953, at * 5 (W.D. Pa. July 17, 2006) (finding that the plaintiff's denial of making false statements were insufficient evidence of pretext that the employer's preferred reason was unworthy of belief).

inferred that the decision-makers knew or should have known the complaints against her were lies. Plaintiff's reliance upon her own belief that the decision-makers were racist because they always believed the claimants and not her is an "'unsupported assertion[ ], conclusory allegation[ ], or mere suspicion[ ] . . [that ] is not sufficient to withstand summary judgment.'" <u>Maurizio v. Fox Chapel Foods, Inc.</u>, No. 02:04CV1168, 2006 WL 2571397, at * 9 (W.D. Pa. Sept. 5, 2006) (quoting <u>Podobnik v. U.S. Postal Serv.</u>, 409 F.3d 584, 594 (3d Cir. 2004).

Defendant adduced evidence to support the decision-makers' position that the September 13, 2008 incident was not an isolated instance of plaintiff's working relationship with her co-workers, but rather was believed to reflect a pattern of rigid and inflexible traits that were not in the best interests of the patients served on its mental health units. Plaintiff desires to proceed to trial on her belief that the decision-makers always believed the accounts given by numerous white employees and patients over her denials. (CSF ¶ 48, ECF No. 38) That belief, even if sincere, is not sufficient evidence. Viewing the record most favorably to plaintiff, the nonmoving party, the court finds that, because the defendant's stated reasons for plaintiff's termination are not so implausible that they are unworthy of credence, plaintiff is unable to satisfy the first prong.

### b. Prong Two

Prong two of the <u>Fuentes</u> framework requires the court to determine if plaintiff "can demonstrate, through evidence of record, that 'discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" <u>Wildi</u>, 659 F.Supp.2d at 670 (quoting <u>Fuentes</u>, 32 F.3d at 762).

In discussing this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the evidence that [the protected activity] was a motivating or determinative factor in the employment decision.

Simpson 142 F.3d at 644–45 (emphasis added). The kinds of evidence that may be relied upon under this prong of the Fuentes analysis are:

> (1) whether employer previously discriminated against plaintiff, (2) whether employer has discriminated against other persons within plaintiff's protected class or within another protected class, and (3) whether employer has treated more favorably similarly situated persons not within protected class.

Wildi, 659 F. Supp. at 671.

i) Whether employer previously discriminated against plaintiff

Plaintiff argues that defendant previously discriminated against her when it chose to credit the accounts of white employees over plaintiff's account of several instances in which plaintiff was suspended or reprimanded for complaints registered against her by her co-workers or patients. This argument is supported only by plaintiff's own subjective belief about the decision-makers' beliefs. Where there is a staff conflict, there may be grounds of discipline. Jackson, 2010 WL 1630737 at *15 (finding, in the context of staff conflict, "it is the employer's belief that governs, and a plaintiff cannot establish pretext by simply challenging the veracity of co-workers' accusations that the employer reasonably credited"). "A plaintiff's subjective opinion that she was treated unfairly is not enough to show pretext. Rather, the *evidence of record* must support a finding that the defendant 'made up' its reason." Menta v. Comm. Coll.

of Beaver Cnty, 428 F.Supp.2d 365, 376 (W.D. Pa. 2006) (quoting Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir.1992)).  Similarly, the testimony of Oliver, another African-American, that he never had any concerns with plaintiff's behavior during the six years that he worked with her, is not sufficient to show pretext.  See Acampora v. Konica Bus. Mach. USA, Inc., Civ. A. No. 95-3936, 1997 WL 214800, at *7 (E.D. Pa. Apr. 22, 1997) (finding that the testimony of a co-worker concerning the plaintiff's good performance is not indicative of pretext; "[w]hat matters is the perception of the decisionmaker.") (quoting Billet, 940 F.2d at 825; see also Macon, 2007 WL 1366789, at **6, 7 ("coworkers' opinions that plaintiff would not have engaged in the conduct for which she was discharged are insufficient to show that the decision-makers were lying in their belief that plaintiff engaged in the conduct;"  the plaintiff's argument that the employer's investigation included written reports of females, but not of plaintiff, did not support an inference of pretext) (citing Martin, 67 F. App'x 109).  What plaintiff failed to do is adduce evidence calling the decision-maker's belief into question.  See Thimons v. PNC Bank, N.A., Civ. A. No. 04-1770, 2006 WL 2089953, at * 5 (W.D. Pa. July 17, 2006) (finding that the plaintiff's denial of making false statements was insufficient evidence of pretext to show the employer's proferred reason was unworthy of belief); see also Sulit, 2009 WL 2776480 at **3, 7 (finding plaintiff failed to call into doubt the evidence that decision-makers relied upon to terminate the plaintiff).  Even if defendant's decision-makers mistakenly took the word of its patients and other employees over plaintiff's word, such mistakes are not evidence of discrimination.  As stated by the district court in Sulit:

> It is not the place of the Court to "sit as a super-personnel department" over the employment decisions of a business. *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 332 (3d Cir.1995). The evidence offered by the plaintiff demonstrates, at most, that the decision makers erred in their determination that Officers Daltwas, Gilchrist and Judge were more credible than the

plaintiff. That alleged error in judgment is not the equivalent of racially discriminatory motivation or influence.

<u>Sulit</u>, 2009 WL 2776480, at *7.

Other than plaintiff's statements that the whites are liars, there is no evidence of record to support plaintiff's inference that defendant chose to believe plaintiff's co-workers because they are Caucasian or to discredit plaintiff because she is African-American.  Plaintiff's belief that she was a victim is not sufficient to carry her burden of proof of pretext.  <u>Weldon v. Kraft</u>, 896 F.2d 793, 800 (3d Cir. 1990).  There is insufficient evidence adduced to show that defendant previously discriminated against plaintiff.

> ii.) <u>Whether Employer Has Discriminated Against Other Persons Within Plaintiff's Protected Class or Within Another Protected Class</u>

Plaintiff does not claim that Hartzell's remarks in 2005 or 2006 were directed at her; rather, plaintiff argues that Hartzell's "racist" remarks are evidence to show that defendant has discriminated against others in plaintiff's protected class.  It is clear from the record that Hartzell was plaintiff's co-worker, not a supervisor.  Therefore, at best, Hartzell's comments would be considered stray remarks by a nondecision-maker.  "'Stray remarks by non-decisionmakers ... unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.'" <u>Fuentes</u>, 32 F.3d at 767 (quoting <u>Ezold</u>, 983 F.2d at 545); <u>see</u> <u>Reich v. Schering Plough Corp.</u>, 399 F. App'x 762, 765 (3d Cir. 2010) (holding that evidence of supervisor's remark four or five years earlier, before he became employee's supervisor did not permit inference of discrimination).  To survive summary judgment, there must be substantial supporting evidence other than isolated remarks of alleged discrimination. As this court has previously noted:

> No decisions of the court of appeals [has held] that stray remarks,
> standing alone, could reasonably be viewed as sufficient to
> establish pretext under the second prong of the *Fuentes* test.
> Instead, in those decisions holding that plaintiff produced
> sufficient evidence to survive summary judgment, there was
> substantial supporting evidence other than the stray remarks to
> support the denial of summary judgment.

Connolly v. Pepsi Bottling Gr., L.L.C., Civ. A. No. 06-1462, 2008 WL 4412090, at * 12 (W.D.

Pa. Sept. 22, 2008) (citing Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir.1997);

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1112 (3d Cir.1997)).

Here, the remark is not temporally related to plaintiff's termination.  The remarks were

made more than one year prior to her termination.  While plaintiff disputes that the speaker who

addressed racial issues was sufficient to counteract the offensive remarks, the temporal distance

and considering that the remark was made by a co-worker and was not being directed to plaintiff

are reasons not to give great weight to this evidence.   The evidence relating to plaintiff is the

comment made by I. Gibson, who was not a supervisor and later apologized to plaintiff.  There

was no evidence that any of defendant's employees in a supervisory capacity were aware of I.

Gibson's comments or encouraged the remarks.  When a decision maker is not aware of a

comment, that comment would not be sufficient to show discrimination.

Plaintiff also points to the termination of other African-Americans as evidence that

defendant discriminated against others in her protected class.  Oliver and Winston, other African-

American former mental health employees of defendant, each testified that they were treated

unfairly in comparison to white employees.  The testimony of both Oliver and Winston,

however, did not show that these employees were terminated for discriminatory reasons.

Although Oliver testified that upon his return from service in Iraq he suffered from severe

PTSD, defendant refused to make any accommodations regarding his schedule, and that

defendant's refusal to accommodate his schedule eventually resulted in his termination of employment, he admitted that the "final straw" was his calling-off on a Saturday morning when he was scheduled to work. (CFS ¶¶ 55, 74.) Although Winston testified that he was consistently assigned to work afternoons on every holiday, while no white employees were given similar assignments, he admitted defendant terminated him for having improper contact with a female patient, even though he disputed the propriety of the contact. There is no evidence of record to show the decision-makers in Winston's situation knew or should have known there was no improper contact. Neither Oliver nor Winston filed a claim of discrimination against defendant. Each testified based upon their subjective beliefs about why the decision-makers were wrong.

Plaintiff was employed as a mental health in the adult unit of the BHU and was supervised by DeLouis, the director of BHS. There is no evidence of record that DeLouis was involved in any decisions relative to Winston's or Oliver's employment. Similarly, there is no evidence that the supervisor of either Winston or Oliver was involved in the decision to terminate plaintiff. See Dickerson v. U.S. Steel Corp., 582 F.2d 827, 831-34 (3d Cir. 1978) (denying joinder of cases claiming of purported denials of promotion made employees performing different types of work with different supervisory personnel in different labor unions and work environments). While two other African-Americans were terminated, there is no evidence to support the belief that these terminations showed defendant discriminated against those persons or that Caucasians in similar situations were not fired.

        iii.)    Whether Employer Has Treated More Favorably Similarly Situated Persons Not Within The Protected Class.

Finally, plaintiff claims that similarly situated employees not within the protected class were more favorably treated. In support, plaintiff points to the coordinator of the BHS, Wetherstein, choosing to accept the word of Brooks, a white employee, and white patients, over

that of plaintiff, an African-American.  Plaintiff offered no evidence, however, to support her belief that management credited Brooks or patients because they were white or discredited plaintiff because she was black.

Plaintiff claims that Nagy should have been disciplined for filing a frivolous complaint against her, but did not offer any evidence that the decision-makers knew or had reason to know Nagy was untruthful or that she harbored any racial animosity toward plaintiff.  Plaintiff asserts that white employees were treated more favorably because they were not disciplined or terminated for behavior similar to plaintiff's behavior.  Plaintiff, however, did not adduce any evidence of other similarly-situated employees of defendant, i.e., those with a record of complaints by co-workers and patients or where a white employee refused to agree with management's assessment that other actions could be taken to deal with situations like that of September 13, 2007, who were not disciplined or terminated.  Plaintiff's comparisons are inapposite.  The record does not include any evidence of an employee who had a record similar to and acted like plaintiff that was not terminated as a result.

**V.**     **Conclusion**

After reviewing the defendant's motion for summary judgment, and the submissions of the parties, the Motion will be granted for the reasons stated above.

Date:  March 18, 2011                                    By the court,

                                                         /s/ JOY FLOWERS CONTI
                                                         Joy Flowers Conti
                                                         United States District Judge